UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

<u>Gary Dolan</u>

     v.                          Civil No. 06-cv-43-JD
                                         Opinion No. 2008 DNH 003

<u>SunGard Securities Finance, LLC</u>
<u>and Global Compliance Services, Inc.</u>

<u>O R D E R</u>

Gary Dolan, proceeding pro se, brought claims against his former employer, SunGard Securities Finance, LLC, and Global Compliance Services, Inc., which provided "Alertline" services for SunGard.  Dolan alleges claims against SunGard of unlawful discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and New Hampshire Revised Statutes Annotated ("RSA") ch. 354-A.  He also alleges wrongful discharge, breach of the covenant of good faith and fair dealing, violation of RSA 275:56, negligent and intentional infliction of emotional distress, negligent misrepresentation, promissory estoppel, fraud and conspiracy to commit fraud, violation of the Equal Pay Act, and breach of contract.  SunGard moves for summary judgment and also moves to strike portions of Dolan's affidavit.  Dolan moves to exclude certain evidence submitted by SunGard and objects to the motion for summary judgment.

I.  Evidentiary Motions

SunGard moves to strike parts of Dolan's affidavit on the grounds that the statements are not based upon personal knowledge and that he is incompetent to make certain statements.  Dolan moves to exclude evidence of emails that he sent while employed at SunGard that were discovered after he was terminated.

A.  SunGard's Motion to Strike Portions of Dolan's Affidavit

"Supporting and opposing affidavits shall be made on personal knowledge. . . ."  Fed. R. Civ. P. 56(e).  "It is black letter law that hearsay evidence cannot be considered on summary judgment."  Davila v. Corp. de P.R. Para La Difusion Publica, 498 F.3d 9, 17 (1st Cir. 2007).  Therefore, an affiant must have first-hand knowledge of the facts sworn to in an affidavit and cannot testify to a belief.  Quinones v. Houser Buick, 436 F.3d 284, 291 (1st Cir. 2006).

In response to SunGard's motion to strike parts of his affidavit, Dolan states that he has no objection to striking paragraphs 4, 11, 12, 19, 20, 25, 28, 32, 35, 37, 38, 41, 44, 46, 47, 49, 54, and 57 in their entirety.[1]  In addition, he does not

---

[1] Dolan appears to be somewhat confused about those statements he concedes and those he intends to defend.  For example, although he included paragraphs 41 and 44 in the list of statements that were not material and could be stricken, he also

object to striking most of the parts of statements in his affidavit that are the subject of SunGard's motion.  Therefore, those statements will not be considered in opposition to SunGard's motion for summary judgment.

SunGard contends that parts of paragraphs 8, 41, 44, 56, 61, and 62 are inadmissible hearsay.  Dolan objects to striking contested statements in paragraphs 4, 8, 41, 42, 44, 56, 61, and 62.[2]  Although Dolan has arguably waived any contest to the statements in the paragraphs he has agreed to strike, all of the challenged statements are addressed as follows.

Statements that were made outside of court and that are offered for their truth are inadmissible hearsay unless an exception applies.  <u>United States v. Rivera–Hernandez</u>, 497 F.3d 71, 80 (1st Cir. 2007).  An affidavit must be based on the personal knowledge of the affiant, not on information provided by someone else, and must show the basis for the affiant's

---

argues that it would be unfair to strike those paragraphs.  He misidentifies paragraph 8 as paragraph 3.  Although he did not agree to striking paragraph 36, he did not address that paragraph in his objection, and therefore any objection is deemed waived. <u>See</u> <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

[2]He states that he can testify that he was experiencing chest pains as stated in paragraph 4 but agrees to strike the remainder of that paragraph.

3

knowledge.  <u>Hoffman v. Applicators Sales & Serv., Inc.</u>, 439 F.3d

9, 16 (1st Cir. 2006).

In paragraph 8, Dolan stated, in pertinent part:  "Sometime

in 1999 a 2nd shift computer operator named Ed Gaffney told me he

had once been a 1st shift CSR like me.  He told me how he had a

disagreement with Ms. Wendy St. Louis (then an entry level CSR).

he stated that while walking away from this confrontation she

said 'see if I help you again you little shit.'"  In paragraph

61, Dolan stated:  "Sometime in the 1st half of 2006 I was told

by several former co-workers that a night shift supervisor named

Joe DeSousa was suspended because of an argument he had with Ms.

St. Louis."  Dolan does not dispute that those statements are

hearsay.  Instead, he represents that he could get an affidavit

or a deposition to support them.  He also argues that it would be

unfair to strike that portion of his affidavit about the

statement attributed to DeSousa because he has been denied access

to DeSousa's personnel file.

If a party is unable to present evidence in opposition to

summary judgment, relief is available under Federal Rule of Civil

Procedure 56(f) only if the party submits an affidavit showing

good cause for the lack of evidence, a plausible basis for his

belief that the needed evidence can be presented with more time,

and an explanation of why additional facts are material to his

opposition.  Rivera-Torres v. Rey-Hernandez, 502 F.3d 7, 10 (1st
Cir. 2007).  "Summary judgment motions are decided on the record
as it stands, not on the pleadings or on the nonmovant's vision
of what facts might some day be unearthed by the litigation
equivalent of an archeological dig."  Rogan v. City of Boston,
267 F.3d 24, 27 (1st Cir. 2001).  Because Dolan did not provide
an affidavit as required under Rule 56(f), he is not entitled to
additional time to support the challenged statements in
paragraphs 8 and 61, which are stricken as inadmissible hearsay.

SunGard objects to Dolan's statements in paragraphs 4 and 41
about medical issues he experienced on the ground that he is not
competent to give medical opinions.  With respect to paragraph 4,
Dolan does not object to striking the part of his statement that
he believed he experienced chest pains because of his work.  With
respect to the statement about the reason he was grinding his
teeth in paragraph 41, Dolan asks to provide a supplemental
affidavit from his dentist, but he did not satisfy the
requirements of Rule 56(f).

Dolan stated in paragraph 44 that a co-worker told him about
her employment reviews and her salary and provided details of
that conversation.  He argues that because the employee told him
that information, he is providing it based on his personal
knowledge.  That is not the case.  Instead, Dolan offers the

5

employee's out of court statement for its truth, which is not admissible.  The objected-to phrase in paragraph 62, that the same employee asked Dolan for help, is also hearsay to the extent the phrase would be used to establish the truth of that statement.

In paragraph 56, Dolan stated that "Mr. Hope had been told of this behavior in the past . . .," which refers to Dolan's problems with a co-worker.  Dolan clarifies this statement in his objection by indicating that <u>he</u> told Hope about the past problems.  Therefore, the statement is deemed to read:  "I told Mr. Hope of this behavior in the past . . . ."  As Dolan would have personal knowledge of his own actions, he would be competent to make that statement in his affidavit.  To avoid the hearsay bar, the statement cannot be used to show what Hope knew, only what Dolan did.

SunGard's motion to strike is granted except as to paragraph 56 which is amended as stated above.

B.  <u>Dolan's Motion to Exclude Evidence</u>

Dolan moves to exclude several emails that he sent while working at SunGard and appends redacted copies of six emails. Dolan states that SunGard discovered the emails after his employment was terminated.  He argues that the emails are

inadmissible because they are offered as evidence of his
character, are not relevant, are more unfairly prejudicial than
probative, and were obtained in an abuse of the discovery
process.  In response, SunGard mistakenly interprets the motion
as an effort to exclude the evidence at trial and argues that the
emails are admissible.

The first disputed email sequence is Dolan's response on
July 2, 2002, to an email sent to him by Geoffrey Fulgione, who
was not a SunGard employee.  The email subject is "Re: Football
pool."  Dolan and Fulgione appear to be discussing plans for the
weekend.  In response to Dolan's message that he had not seen
Fulgione's message "until yesterday," Fulgione wrote:  "You
drunk.  I think Tim will be up at the cottage.  I might head up
Friday night.  Tripoli Friday?"  Dolan replied that he did not
know what he was doing and asked for Tim's number.  Fulgione then
asked for Dolan's address.  Dolan replied:  "My address is 3
Wellesley Drive, Pelham  03076, I do own a gun."

SunGard cites the July 2 email in support of the decision to
terminate Dolan in April of 2005, contending it is proof that
Dolan owned a gun.  The cited email appears to be banter between
Dolan and Fulgione, which is taken out of context, and does not
persuasively establish that Dolan owned a gun.  Therefore, given

its limited probative value, that email appears to be more unfairly prejudicial than probative.  See Fed. R. Evid. 403.

The next email series begins on October 27, 2004, and ends with an email from Dolan on October 29, 2004.  The first email exchange shows a subject of "RE: Account Loanet" and listed Jim Hope, Cindy Zunke, Shawna Fortier, and Jessie Cannon as recipients, but not Dolan.  The exchange appears to be a discussion of whether SunGard should provide an additional "label" to a customer.  On October 29, Dolan wrote to Cindy Zunke:  "I agree with you.  This is a major decision to be made which may cost millions of lives.  I'll handle it.  Is our management here pathetic or what?"  Taken out of context, it is impossible to understand the tone or meaning of Dolan's email.

On November 8, 2004, Fulgione's email asked Dolan, "Are you still alive?  What's new?" and Dolan replied:  "I'm in a major battle with my company to get more money, I'll probably get fired or quit soon, just started a border war with my neighbor over leave [sic] disposal, my daughter is married to a friggin loser, and . . . .  But you know me, I can't complain."  In January of 2005, Dolan responded to an email from a fellow employee, Deanna Basnett, which has a subject line of "I'm in the 2% interesting . . . " by saying "And you're an ugly bitch!"  In March, he complained to Susan Farrell that "they" were making up new

8

policy, that he thought he was about ready to snap, and described punching Deanna Basnett.  In March, he also responded to an email forwarded to him by "Melissa" with a subject of "Prison vs. Work," comparing, negatively, the attributes of work with prison, by saying:  "I've been thinking about killing a few people at work, thanks for the many good reasons!"

SunGard points to these emails as evidence of Dolan's negative attitude and violent nature.  Taken out of context, the cited emails appear to provide little evidence of either issue.  Because these emails were not known to SunGard until after the termination decision was made, they would be relevant, if at all, only to SunGard's assertion that it would have terminated Dolan because of the emails, if they had been discovered before he was terminated for other reasons.  Given their limited probative value and the potential for unfair prejudice, they will not be considered for purposes of summary judgment.


II.  <u>Motion for Summary Judgment</u>

SunGard moves for summary judgment on the ground that Dolan cannot prove any of his claims against it.  Dolan opposes summary judgment as to all claims except his claims of promissory estoppel and breach of contract, which he omits from his objection.  In its reply, SunGard interpreted Dolan's omission to

mean that he concedes summary judgment on those claims.  Because
Dolan did not dispute that inference in his surreply, those
claims are deemed waived.

## Standard of Review

Summary judgment is appropriate when "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c).  The party seeking summary judgment must first demonstrate
the absence of a genuine issue of material fact in the record.
See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A party
opposing a properly supported motion for summary judgment must
present competent evidence of record that shows a genuine issue
for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
256 (1986).  All reasonable inferences and all credibility issues
are resolved in favor of the nonmoving party.  See id. at 255.

The local rules of this district require a party who moves
for summary judgment to file a memorandum in support of the
motion that "incorporate[s] a short and concise statement of
material facts, supported by appropriate record citations, as to
which the moving party contends there is no genuine issue to be

tried."  LR 7.2(b)(1).  In response, the party opposing summary judgment must also file a memorandum incorporating "a short and concise statement of material facts, supported by appropriate record citations, as to which the adverse party contends a genuine dispute exists so as to require a trial."  LR 7.2(b)(2). "All properly supported material facts set forth in the moving party's factual statement shall be deemed admitted unless properly opposed by the adverse party."  Id.

SunGard provided a statement of material facts in its memorandum in support of summary judgment with citations to the record.  Dolan did not include a statement of material facts in his opposition to summary judgment.  Dolan did submit his affidavit, which is substantially limited by SunGard's motion to strike, and exhibits in support of his opposition.  Although Dolan did not provide a factual statement, because of his pro se status, his properly supported facts will be considered in opposition to SunGard's factual statement.

Background

Gary Dolan worked at SunGard Securities Finance, LLC, from November 5, 1998, until April of 2005.  SunGard provides software and processing solutions for the securities lending segment of the financial services industry.  Dolan was a Client Services

11

Representative ("CSR") who answered telephone calls from SunGard
clients needing information and assistance.  Wendy St. Louis,
Assistant Vice President of Client Services, supervised the CSRs
and reported to Richard Stinchfield, Vice-President of Client
Services.

In 1999, Dolan completed the probationary period and became
a permanent employee.  Although he tendered his resignation
during the spring of 1999, because of stress he believed was
associated with his work, Dolan was persuaded to stay in his job
at SunGard.  In early 2001, three additional CSRs were hired, one
male and two females, and Dolan helped to train them.  Dolan's
performance review for 2001 gave him an overall rating of 2.84 on
a scale of 1 to 5, and noted his hard work but also that he
tended "to project a negative attitude towards customers/co-
workers.  Needs to focus on a positive approach."

Beginning in 2002, Dolan felt humiliated by remarks his
supervisor, Wendy St. Louis, made to him in front of his co-
workers.  The remarks that Dolan objected to were about taking
breaks during work.  His performance review for 2002 lists an
overall score of 2.85.  The 2002 review noted that "[t]eamwork,
planning, communication and flexibility are areas that continue
to need improvement.  Gary needs to spend less time socializing
to ensure his assigned work is completed in a timely accurate

12

manner.  He should concern himself less with what others are
doing or not doing and concentrate on his own responsibilities."

During 2002, one of the CSRs hired in 2001, Valarie
Thorgerson, was promoted within the Client Services Group, and
Dolan felt that he should have been promoted instead of
Thorgerson.  In April of 2004, while St. Louis was on vacation,
Dolan and Thorgerson got into an argument about Thorgerson's
supervisory authority.  During a departmental meeting on May 6,
St. Louis appointed Thorgerson as the supervisor when St. Louis
was absent, and Dolan objected.  Dolan also told St. Louis that
"the constant abuse I had been enduring from her was going to
stop and demanded to speak to Mr. Grimaldi about it."  Dolan Aff.
¶ 21.  The next day, Dolan met with John Grimaldi, Vice President
and General Manager of SunGard Securities Finance LLC, St. Louis,
and Stinchfield.  Grimaldi and Stinchfield affirmed St. Louis's
decision to give supervisory authority to Thorgerson.  After that
meeting, Dolan asked to speak with Grimaldi alone and told him
about the abusive treatment he was receiving from St. Louis.  He
also expressed concern that St. Louis would fire him for
complaining about her.

On August 2, 2004, St. Louis stopped Dolan as he was about
to leave for the day and asked if he had finished a particular
assignment.  Dolan did not remember getting the assignment but

offered to finish it.  St. Louis called him "useless" and told
him to go home.

On August 5, Dolan brought his complaints about St. Louis to
Dennis Molloy, a human resources liaison at SunGard.  Dolan said
St. Louis belittled him in front of his co-workers and that her
treatment of him made his co-workers uncomfortable.  He said that
when confronted by Dolan and the other CSRs about her remarks,
St. Louis said she was only kidding.  Dolan remembers telling
Molloy that he believed St. Louis singled him out because he was
the only male in the group, but Molloy's notes from the meeting
do not include that complaint.  The next day, Dolan met with
Molloy and Grimaldi to discuss his complaints about St. Louis.
Molloy wrote in his notes that Dolan complained about the abusive
treatment he had received from St. Louis, objected to her
management style, and said that his primary issue was the way St.
Louis treated and spoke to him and his co-workers.  Dolan
remembers that Grimaldi told him St. Louis's actions were against
company policy, although that is not included in Molloy's notes.

A meeting was called on August 16 with Dolan, St. Louis,
Grimaldi, and Molloy to discuss Dolan's concerns.  Dolan
describes the meeting as a disciplinary action, with Grimaldi and
Molloy "ganging up" against him and questioning him about his
actions without directing any questions to St. Louis.  He states

14

that St. Louis said nothing except to give him a short sarcastic
apology.  Dolan states that he asked to have his co-workers come
in to corroborate his perception of St. Louis's remarks and, in
particular, that Thorgerson should be brought into the meeting.
Grimaldi told him that the meeting was about him, not his co-
workers.  Dolan thought that Grimaldi was trying to goad him into
an argument.  Dolan remembers that Molloy left the meeting after
about ninety minutes and that he continued the discussion with
Grimaldi and St. Louis.  Dolan remembers they discussed his
concerns that he would be terminated in retaliation for his
complaint about St. Louis.

Molloy took notes during the August 16 meeting that give a
somewhat different picture.  In his notes, Molloy wrote that St.
Louis explained her remarks as having been made in jest but that
Dolan did not perceive them in the way she intended.  Molloy
stated that both Dolan and St. Louis were somewhat responsible
for inappropriate comments and that Grimaldi stressed using
discretion in workplace communications.  Molloy found that St.
Louis was more receptive to the suggestions given to her and that
Dolan was less receptive.  He wrote that Dolan was defensive,
felt "ganged up on," and continued to bring up other issues and
subjects despite their efforts to redirect him to the concerns
being addressed at the meeting.  He stated that Dolan asked why

his performance was being questioned and was told that the meeting was not about his performance.  Molloy wrote that Dolan "left the meeting feeling frustrated" and called in sick for two days after the meeting.

On August 20, 2004, Dolan called SunGard's "Corporate Compliance Alertline" to report his complaint about St. Louis's actions.  SunGard contracted with Global Compliance Services, Inc. to receive telephone calls of complaints from SunGard employees, through the Corporate Compliance Alertline.  The Alertline service provides a Communication Specialist at Global who answers the calls, interviews the callers, and enters the information provided in a report.  Global's system generates an automated notice that is sent by email to its client and also provides for more immediate contact by telephone in case of higher priority issues.  Once Global's client is notified of the call, Global can no longer access the report.

The report generated by Global for Dolan's call shows that he identified himself, named Molloy and Grimaldi as others involved, stated that St. Louis was the subject of his complaint, and listed co-workers, including Thorgerson, as witnesses.  In summary, the report states that Dolan said St. Louis had been harassing him for the past three and a half years and that he had been trying to bring his complaint to the attention of management

16

but had only faced reprisals as a result.  Additional details
provided are that St. Louis belittled Dolan in front of his co-
workers by calling him "useless," that during an hour-long
meeting about the problem Grimaldi took St. Louis's side and did
nothing to correct the situation, and that St. Louis once yelled
at him, "You won't get a break until you're at least 20 percent
as productive as I am!"

A few days after Dolan's call, Paul Jeffers, SunGard's Vice
President of Human Resources, called Dolan at work and discussed
Dolan's complaint about St. Louis.[3]  Dolan and Jeffers continued
to communicate by telephone and email over the next few months.
Jeffers's emails identified him as "Vice President, Human
Resources, SunGard."  Jeffers concluded that no violation of
company policy had occurred but continued to communicate with
Dolan until a telephone conversation on December 28, 2004, when
Dolan reported that things were "going okay" with St. Louis.
Dolan states that he complained to Jeffers during that call about
being overlooked for promotions and being turned down for other

---

[3]Dolan states in his affidavit that Jeffers only identified
himself in the first telephone call by giving his name, not his
position at SunGard.  SunGard represents, supported by Jeffers's
affidavit, that Jeffers identified himself as the Vice President
of Human Resources at SunGard.  Dolan acknowledges that he knew
Jeffers worked at SunGard by September or October of 2004.

positions and that Jeffers referred him to a human resources manager in SunGard's Birmingham, Alabama, office.

Between August and November of 2004, Dolan applied for but was denied three open positions at SunGard.  In each case, Dolan was told that he was not qualified for the position.  He contends that he was qualified and that Grimaldi told the managers who were hiring for the open positions not to hire him.[4]

On November 2, 2004, Dolan met with St. Louis, Molloy, and Jim Hope, SunGard's Vice President of Operations.  Molloy again took notes during the meeting.  Dolan asked that he be given a good performance review and a raise of $5000.  Hope told Dolan that salaries were based on performance reviews, that the evaluations were not yet complete, and that they could not discuss other employees' salaries with Dolan.  Dolan contends that sometime later he met with Molloy, Grimaldi, and Julie Keefe, SunGard's Chief Financial Officer, to discuss his requested promotion from a "1st line" to a "2d line" position and that Grimaldi stated those job descriptions were outdated.

Dolan's performance review for 2004, which was completed during January of 2005, shows an overall rating of 3.19 on a scale of 1 to 5.  In the section of the review for employee

---

[4]Dolan agreed to strike the paragraphs of his affidavit that pertain to his applications for these positions.

comments, Dolan responded to the criticisms of his performance, arguing that the review undervalued his services and misstated his performance.  He argued that he should be promoted to a 2d line employee status.

On February 4, 2005, Dolan met with Stinchfield and St. Louis to discuss his performance review.  Stinchfield wrote a report of the meeting that he emailed to Dolan and St. Louis. The first issue discussed was the "pervading theme" that Dolan was not happy working at SunGard, and in response, Dolan indicated that he would try to have a positive attitude with his co-workers and about his job.  The second issue was Dolan's belief that he was singled out for criticism by management. Stinchfield wrote that SunGard encourages positive social interaction but only to the extent it does not cause a significant loss in productivity and that Dolan was not singled out for criticism of his work habits.  Dolan also complained about being turned down for three positions, and Stinchfield states that Dolan was not qualified for those positions.  Third, Dolan was assured that his review was done by management collectively, not just St. Louis, and was also told that St. Louis advocated for him.  Fourth, Dolan was told that management appreciated his work, and Stinchfield wrote that he expected "that the negativity has moved into the past, clearing the way

for you to move forward with us."  Stinchfield stated that their "fundamental agreement" from the meeting was that Dolan would "attempt to take a more constructive and proactive approach to raising [his] concerns."

At that time, there were four CSRs in Dolan's group, three of whom were women.  Dolan received the second highest salary. Thorgerson received the highest salary.  Dolan states that he received the lowest pay increase in his group despite having a better performance review score than Basnett, a female co-worker, and similar comments to those received by Thorgerson.

Thorgerson remembered that Dolan often projected a negative attitude at work and would yell at co-workers or speak abruptly. After handling a challenging call, Dolan would often slam down the receiver and scream an angry expletive.  She thought that Dolan became more angry during the spring of 2005.

After his performance review, St. Louis noticed that Dolan would sometimes refuse to participate in group meetings.  In early March, St. Louis told Dolan that his request for vacation during the week of the Fourth of July had been denied in favor of Thorgerson.  During a group meeting on March 11, Dolan raised the vacation issue, yelling loudly at St. Louis and Thorgerson, and banging his hands on the table.  Stinchfield was called to deal with Dolan after the outburst.  Thereafter, Thorgerson complained

to St. Louis and Stinchfield that she was concerned that Dolan might physically harm her or one of their co-workers.  She said she was particularly concerned because Dolan had acted in a negative and hostile manner and had talked about owning a gun.

In April another incident occurred with a co-worker.  Dolan told St. Louis that the co-worker had thrown one of his work papers in the garbage.  St. Louis told him to get it out of the garbage, which angered Dolan.

During the week of April 12, SunGard's president, Brian Traquair, Grimaldi, Stinchfield, Molloy, Hope, and Keefe met to discuss Dolan's attitude and conduct, which they perceived to be negative and hostile.  They also discussed concerns for other employees' safety.  After their discussions, they decided to terminate Dolan's employment.

Stinchfield and Molloy met with Dolan on April 15 to notify him that he was terminated.  Dolan remembers that he was told he was being terminated because he had not improved his negative attitude after his 2004 performance review.  Dolan told Stinchfield and Molloy he thought he was being terminated in retaliation for his complaints about St. Louis, but they said that it was not a disciplinary termination and that he would be eligible for severance pay and unemployment benefits.

After his termination, Dolan called the Alertline and asked to speak with Jeffers.  He was told that he could not be given the contact information.  Dolan obtained Jeffers's telephone number through SunGard's human resources department and left him a message that he had been terminated in retaliation, as Dolan had previously discussed with Jeffers.  In August of 2005, Dolan made a second complaint through the Alertline.

Dolan filed a complaint with the EEOC, alleging that SunGard discriminated against him because of his gender and retaliated against him for making complaints about discriminatory treatment. The EEOC denied his complaint, finding that the evidence supported SunGard's non-discriminatory reason for terminating Dolan's employment because of his negative attitude and did not show he was treated differently based on his gender.

## Discussion

Dolan contends that SunGard discriminated against him because of his gender and retaliated against him because of his complaints about St. Louis's treatment of him, in violation of Title VII and RSA 354-A.  He also alleges wrongful discharge, breach of the covenant of good faith and fair dealing, violation of RSA 275:56, negligent and intentional infliction of emotional distress, negligent and intentional misrepresentation, fraud,

22

conspiracy to commit fraud, and violation of the Equal Pay Act of 1963.  SunGard seeks summary judgment on all claims.

A.  Title VII and RSA 354-A

Both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and RSA chapter 354-A provide a cause of action for gender discrimination and discriminatory retaliation.  The New Hampshire Supreme Court relies on case law under Title VII in analyzing claims under chapter 354-A.  Madeja v. MPB Corp., 149 N.H. 371, 378 (2003); see also Dennis v. Osram Sylvania, Inc., 2007 WL 2783369 at *6 (D.N.H. Sept. 24, 2007).  Therefore, those claims are considered together under the same standards.

1.  Discrimination

Dolan alleges that SunGard discriminated against him based on his gender by treating him differently than his female co-worker, Valarie Thorgerson, and by subjecting him to a hostile work environment.  SunGard moves for summary judgment on a claim that Dolan does not appear to assert, that he was terminated because of his gender.[5]  In his objection, Dolan continues to

_____

[5]SunGard raises an issue of the limitations period in a one-sentence footnote.  Def. Mem. p. 13, n.9.  Because that issue is not sufficiently developed, the court will not consider it.  See Zannino, 895 F.2d at 17;  Higgins v. New Balance Athletic Shoe,

assert that the discrimination he claims is based on disparate treatment and a hostile work environment.

To the extent Dolan might have raised a discrimination claim based on his termination, that claim is deemed to be waived. Because SunGard failed to address the discrimination claim on the grounds that Dolan raised, disparate treatment and a hostile work environment, summary judgment is denied on counts one and two.[6]

2.  <u>Retaliation</u>

Dolan alleges that SunGard retaliated against him, because of his complaints about St. Louis, by denying him opportunities for financial gain, subjecting him to a higher level of scrutiny, harassing him, and terminating his employment.  More specifically, Dolan asserts retaliation based on the denial of his applications for three positions within SunGard, failing to promote him to a 2d line CSR position, and terminating his employment based on a pretextual reason.  SunGard asserts that

<u>Inc.</u>, 194 F.3d 252, 260 (1st Cir. 1999).

[6]In a footnote, SunGard merely notes that Dolan alleged a discriminatory hostile environment, states that his allegations were insufficient, and asserts in a conclusory manner that Dolan cannot prove a hostile environment claim.  In its reply, SunGard reprimands Dolan for failing to address in his objection the discrimination claim SunGard briefed, which is not the claim Dolan alleged in his complaint.

Dolan did not engage in protected activity, did not suffer an
adverse employment action prior to his termination, was not
qualified for the other jobs he sought within SunGard, and was
terminated because of his ongoing negative and hostile attitude.

To prove retaliation, Dolan must "provide evidence that (1)
[he] engaged in protected activity; (2) [he] suffered some
materially adverse action; and (3) the adverse action was
causally linked to [his] protected activity."  Dixon v. Int'l
Bhd. of Police Officers, 504 F.3d 73, 81 (1st Cir. 2007).  Making
a complaint about discrimination is protected activity.[7]  See
Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 175 (1st Cir. 2003).
"[C]oncrete documentation [is] necessary to prove the causal link
between [a plaintiff's] protected activity and her retaliatory
treatment."  Ramos v. Roche Prods., Inc., 936 F.2d 43, 49 (1st
Cir. 1991).

a. Adverse Employment Actions

Assuming a disputed issue as to whether Dolan's complaints
were protected activity, SunGard asserts that Dolan cannot show
that heightened scrutiny or denial of his applications were

---

[7]For a retaliation claim, complaints about discrimination
are protected even if it is determined later that no
discrimination actually occurred.  See Feliciano-Hill v.
Principi, 439 F.3d 18, 26 (1st Cir. 2006).

adverse employment actions.  "An employment action, to be
adverse, must materially change the conditions of the plaintiff's
employment . . . ." <u>Valentin-Almeyda v. Municipality of
Aguadilla</u>, 447 F.3d 85, 95 (1st Cir. 2006) (internal quotation
marks omitted).  The action must be sufficiently adverse to
"dissuade a reasonable worker from making or supporting a charge
of discrimination."[8] <u>Dixon</u>, 504 F.3d at 81.

When a plaintiff claims retaliation based on an employer's
decision to deny his application, "an 'adverse employment action'
requires a showing that (1) she applied for a particular position
(2) which was vacant and (3) for which she was qualified.  In
addition, of course, she must show that she was not hired for
that position." <u>Velez v. Janssen Ortho, LLC</u>, 467 F.3d 802, 803
(1st Cir. 2006).  There is no dispute that Dolan applied for
three open positions at SunGard and his application was denied as
to all three.  The hiring managers for the three positions state
in their affidavits, however, that Dolan was not hired because he
was not qualified for the jobs.  Although Dolan disputes the
hiring managers' assessments of the job requirements and his
qualifications, he agreed to strike the portions of his affidavit
that support his view.  Even if the stricken parts of his

---

[8]As noted above, New Hampshire follows federal case law in
interpreting RSA chapter 354-A.  <u>Madeja</u>, 149 N.H. at 379.

26

affidavit were considered, Dolan's differing views and speculation about the reasons he was not hired for those positions would not be sufficient to oppose summary judgment. Therefore, Dolan has not shown a triable issue as to whether he was improperly denied the three positions.

Dolan contends that he was subjected to heightened scrutiny and that SunGard failed to investigate his complaints.  His evidence of heightened scrutiny is that Stinchfield testified in his deposition that in response to St. Louis's concerns about Dolan's negative attitude, he told St. Louis that they "would have to keep an eye on him."  Pl. Ex. 25, p. 67.  Even assuming that Stinchfield and St. Louis did "keep an eye on" Dolan, that alone does not suggest an adverse employment action.  In the absence of evidence of how heightened scrutiny negatively affected his work environment, Dolan has not provided competent evidence to support that part of his claim.  See Davis v. Emery Worldwide Corp., 267 F. Supp. 2d 109, 125 (D. Me. 2003).

Even assuming that failing to properly investigate workplace complaints would be an adverse employment action in certain circumstances, the record does not support Dolan's claim that SunGard failed to investigate his complaints.  Although Dolan disagrees with the way his complaints were handled and the outcome, he cannot dispute that SunGard addressed them.

Therefore, Dolan's dissatisfaction with the investigation is not a basis for an adverse employment action in this case.

It is undisputed that his termination was an adverse employment action.  In addition, as noted above, Dolan contends that he was denied promotion within the CSR group in retaliation for his complaints against St. Louis.  SunGard failed to address that part of Dolan's claim, and therefore, it is not considered for purposes of summary judgment.

    b.  <u>Causally Linked</u>

Dolan must also show that the adverse actions he asserts were causally linked to his complaints.  Even if Dolan could show that he was qualified for the three internal SunGard positions, he has not shown that the managers' decisions to deny his applications were causally linked to his complaints about St. Louis.  Dolan lacks evidence that the hiring managers' decisions were related to his complaints about St. Louis.  Further, the stricken parts of his affidavit provide only speculation, not concrete documentation, about a possible link between his complaints and the decisions not to hire him.

Dolan argues that he was terminated because of his complaints of St. Louis's discrimination against him.  SunGard asserts that Dolan was terminated because of his negative

28

attitude and hostile conduct.  The record provides ample evidence of Dolan's negativity and hostility in the workplace.  The record also supports SunGard's view that instead of improving, Dolan's attitude was becoming more negative and hostile.  St. Louis and Thorgerson were concerned that he might harm them or someone else at work.

Dolan challenges the logic of SunGard's reasons for terminating him and suggests other motives but offers no evidentiary support for a causal link between his complaints and the decision to terminate his employment.[9]  Dolan's attacks on SunGard's reasons for firing him are not persuasive in light of the record of his behavior.  Standing alone, the more than seven months between his complaints in August and the termination decision in April is too long to support an inference of a connection.[10]  See Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 337–38 (1st Cir. 2005) (interval of four months between protected activity and decision to terminate too

---

[9]Dolan argues that SunGard began to advertise for his replacement in March before St. Louis and Thorgerson complained about him.  He acknowledges, however, that after he was terminated, several new CSRs were hired, not just a replacement for his position, suggesting that SunGard was advertising for new positions.

[10]Dolan contends that he continued to complain about St. Louis until shortly before he was fired.

long to support inference of retaliation).  He offers no evidence
of a retaliatory motive or that others engaging in the same
conduct as he had done were not fired.  Id. at 338.  In addition,
Dolan received a raise along with a better-than-average
performance review for 2004, after he made his complaints, which
undermines an inference of retaliation.  See Bennett v. Saint-
Gobain Corp., --- F.3d ---, 2007 WL 3227393, at *8 (1st Cir. Nov.
2, 2007).

     In the absence of evidence of a material factual dispute as
to whether the managers' decisions not to hire Dolan and
SunGard's termination decision were causally linked to Dolan's
complaints, SunGard is entitled to summary judgment on the
retaliation claim based on those grounds.  Because SunGard did
not address the claim based on Dolan's lack of promotion within
the CSR group, that part of the claim is not resolved.


B.  Wrongful Discharge

     In his complaint, Dolan alleges that he was wrongfully
discharged because SunGard terminated his employment in
retaliation for his reports of workplace discrimination.  For
purposes of opposing SunGard's motion for summary judgment, Dolan
adds that he was discharged because he refused to be pressured

into working more hours without pay and without positive acknowledgment.  SunGard opposes both grounds for Dolan's claim.

Under New Hampshire law, "[t]o succeed on [a wrongful discharge claim], a plaintiff must prove: (1) [that] the termination of employment was motivated by bad faith, retaliation or malice; and (2) that she was terminated for performing an act that public policy would encourage or for refusing to do something that public policy would condemn." Lacasse v. Spaulding Youth Ctr., 154 N.H. 246, 248 (2006) (internal quotation marks omitted).  The public policy element of a wrongful discharge claim focuses on the plaintiff's actions in relationship to public policy and is not satisfied by merely stating a public policy.  Howard v. Dorr Woolen Co., 120 N.H. 295, 297 (1980).  Public policy may be statutory or non-statutory.  Karch v. BayBank FSB, 147 N.H. 525, 537 (2002).  If the asserted policy is statutory, a wrongful discharge claim is barred if the asserted statute preempts the common law claim. Bliss v. Stow Mills, Inc., 146 N.H. 550, 553-54 (2001).

1.  Retaliation for Complaints about Discrimination

SunGard argues that Title VII preempts Dolan's wrongful discharge claim based on a public policy against retaliation for activity protected under Title VII.  SunGard did not provide the

preemption analysis necessary to support that defense.  See id.
Therefore it is denied.

Alternatively, SunGard contends that claim fails because
Dolan cannot provide factual support to oppose summary judgment.
As is discussed in the context of Dolan's Title VII and RSA
chapter 354-A, he has not shown that a material factual dispute
exists about the reason for his termination.  Therefore, SunGard
is entitled to summary judgment on his wrongful discharge claim
based on his theory that he was discharged in retaliation for his
complaints about gender discrimination.

2.  Complaints of Work without Pay

Dolan's new theory in support of his wrongful discharge
claim is that he was terminated because he refused to work harder
and longer hours than others without pay or any other positive
acknowledgment of his efforts.  He relies on Scannell v. Sears
Roebuck & Co., 2006 WL 2570601 (D.N.H. Sept. 6, 2006) to support
his claim.  SunGard asserts that Dolan cannot prove that he was
wrongfully discharged because he refused to work without pay.

In Scannell, the plaintiff alleged that she was
constructively discharged from her job at Sears "when she refused
to continue to work longer and longer hours without compensation
or any other appreciation from her employer."  Id. at *3.  Dolan

lacks any evidence that he worked more hours than he was paid to
do.  In addition, Dolan never refused to work because of long
hours or otherwise; instead, he was fired because of his negative
and hostile attitude.  Therefore, Dolan has not shown that a
triable issue exists as to his new theory of wrongful discharge.


C.  <u>Breach of the Covenant of Good Faith and Fair Dealing</u>

     Dolan contends that SunGard terminated his at-will
employment in breach of the covenant of good faith and fair
dealing.  In the context of at-will employment, an employer
breaches the covenant "by firing an employee out of malice or bad
faith in retaliation for action taken or refused by the employee
in consonance with public policy."  <u>Centronics Corp. v. Genicom
Corp.</u>, 132 N.H. 133, 140 (1989); <u>accord</u> <u>Harper v. Healthsource
N.H., Inc.</u>, 140 N.H. 770, 776 (1996).  As such, breach of the
covenant of good faith and fair dealing in firing an at-will
employee is the same as wrongful discharge.  Therefore, SunGard
is entitled to summary judgment on this claim.


D.  <u>Violation of RSA 275:56</u>

     Dolan contends that SunGard violated RSA 275:56 by failing
to disclose Molloy's notes about the August meetings as part of
his personnel file in August of 2004.  He contends that those

notes were then used against him in opposing his complaint to the

EEOC.  He seeks an award of damages for the alleged violation.

RSA 275:56 requires employers to provide "a reasonable

opportunity for any employee who so requests to inspect such

employee's personnel file and further, upon request, provide such

employee with a copy of all or part of such file."  The term

"personnel file" as used in the statute is defined in the

administrative code as:

> any personnel records created and maintained by an
> employer and pertaining to an employee including and
> not limited to employment applications, internal
> evaluations, disciplinary documentation, payroll
> records, injury reports and performance assessments,
> whether maintained in one or more locations, unless
> such records are exempt from disclosure under RSA
> 275:56, III or are otherwise privileged or confidential
> by law.  The term does not include recommendations,
> peer evaluations or notes not generated or created by
> the employer."

N.H. Admin. Lab. Code § 802.09.

SunGard contends that Molloy's notes were not part of

Dolan's personnel file and, therefore, did not have to be

disclosed to him when he asked for his file in August of 2004.

Nevertheless, SunGard provided a copy of Dolan's personnel file,

along with copies of Molloy's notes, in response to Dolan's

attorney's request for the file in May of 2005.[11]   SunGard also

---

[11]Dolan filed suit in state court in December of 2005 pro
se, and SunGard removed the case to this court.  Prior to that
time, Dolan was represented by an attorney in his dealings with

faults Dolan for failing to provide a written statement of any disagreement with information in the personnel file.

SunGard does not suggest that Molloy's notes were not created by the employer.  The notes pertain to an employee and would fall into an area that is similar to the listed categories. Given the breadth of the definition of personnel file, Molloy's notes are covered by the definition.  Therefore, if the notes were available on August 19, 2004, when Dolan asked to review his personnel file, they should have been provided to him.

As a preliminary matter, however, neither party addresses the basis for Dolan's claim for damages under RSA 275:56.  The statute does not explicitly provide for such a cause of action. While current and former employees can enforce their right under the statute to inspect and obtain a copy of their files, no reported cases have interpreted the statute to provide a claim for damages if an employer improperly withholds a file.  See Pivero v. Largy, 143 N.H. 187, 189-90 (1998); Rix v. Kinderworks Corp., 136 N.H. 548, 549 (1992).  When a statute does not provide an explicit cause of action, the court must determine whether an implied right exists.  Cross v. Brown, 148 N.H. 485, 487 (2002). In the absence of either an explicit or implicit right of action under the asserted statute, the claim does not exist.  See

SunGard after his termination.

35

<u>Blagbrough Family Realty Tr. v. A & T Forest Prods., Inc.</u>, 155
N.H. 29, 45 (2007).

Dolan has not shown that an implicit cause of action exists
under RSA 275:56.  Because of his pro se status and SunGard's
failure to raise the issue, Dolan will be given an opportunity to
show the basis for his claim.  As both the law and the pertinent
facts that govern Dolan's claim under RSA 275:56 are unsettled,
summary judgment is not appropriate.

E.   <u>Infliction of Emotional Distress</u>

Dolan claims that SunGard intentionally and negligently
inflicted emotional distress by denying him opportunities for
advancement within SunGard, by terminating his employment, and by
failing to produce his gender discrimination complaint to the
EEOC.  SunGard contends that Dolan cannot prove his claims.

1.   <u>Intentional Infliction of Emotional Distress</u>

To support a claim of intentional infliction of emotional
distress, a plaintiff must submit evidence to show that the
defendant caused him severe emotional distress by "extreme and
outrageous conduct."  <u>Konefal v. Hollis/Brookline Coop. Sch.
Dist.</u>, 143 N.H. 256, 260 (1998).  Extreme and outrageous conduct
is that which goes "beyond all possible bounds of decency, and

36

[is] to be regarded as atrocious, and utterly intolerable in a civilized community." Moss v. Camp Pemigewassett, Inc., 312 F.3d 503, 511 (1st Cir. 2002) (construing New Hampshire law). "[I]ndignities, annoyances, or petty oppressions that one may expect to encounter in one's daily life" are not sufficient grounds for a claim of intentional infliction of emotional distress. Godfrey v. Perkin-Elmer Corp., 794 F. Supp. 1179, 1189 (D.N.H. 1992).

In response to SunGard's motion for summary judgment, Dolan describes his working environment as being understaffed and causing him stress.[12]  He contends that his superiors abused their positions of authority by forcing him to work under stressful conditions that were then ameliorated by hiring additional CSRs after he was terminated.

Dolan's description of the circumstances that he says caused him severe distress do not rise above the indignities, oppressions, and annoyances that commonly occur in the workplace. As he has not shown a triable issue in regard to his claim of

---

[12]In his objection, Dolan does not support that part of his claim, alleged in his complaint, that SunGard's failure to allow him opportunities for advancement and its decision to terminate him were the cause of his severe emotional distress.  He also does not mention any issue pertaining to evidence presented to the EEOC.

37

intentional infliction of emotional distress, SunGard is entitled
to summary judgment on that claim.

    2.  <u>Negligent Infliction of Emotional Distress</u>

    A claim of negligent infliction of emotional distress must
be based on sufficiently serious emotional distress.  <u>Thorpe v.
State</u>, 133 N.H. 299, 303 (1990).  To prove the claim, therefore,
a plaintiff must establish "that physical injury resulted from
the emotional distress," and "expert testimony is required to
prove physical symptoms suffered from alleged negligent
infliction of emotional distress."  <u>In re Bayview Crematory, LLC</u>,
930 A.2d 1190, 1195 (N.H. 2007).

    SunGard contends that Dolan lacks evidence to show that he
suffered a physical injury caused by his distress and that he
lacks expert testimony to support any claimed injury.  Dolan
responds that he ground his teeth at night while employed at
SunGard, as a result of the stress he experienced at work, which
caused him to break a tooth in February of 2007, almost two years
after his employment at SunGard ended.  He also asserts that he
spent a weekend in February of 2007 in the psychiatric ward of a
hospital.

    Dolan offers no medical records or other competent evidence
to support his claims of physical injury and extreme emotional

distress or to link the cited issues to his work experiences.
Instead, he states that he believes he can prove his claim with
the help of expert testimony.  Because he has not disclosed an
expert witness on that subject, however, and has not provided
expert testimony in support of his claim, he cannot avoid summary
judgment on the claim.


F.  Misrepresentation and Fraud

     Dolan alleges claims of negligent and intentional
misrepresentation based on his communications with Paul Jeffers
and claims of fraud and conspiracy to commit fraud based on
SunGard's handling of his complaints.  SunGard moves for summary
judgment on these claims.  Because intentional misrepresentation
and fraud are the same tort, those claims are addressed together.


     1.  Negligent Misrepresentation

     Negligent misrepresentation occurs when a defendant makes a
representation, which is material to the plaintiff's decision,
that the defendant should have known was false and the plaintiff
reasonably relies on the representation to his detriment.
Snierson v. Scruton, 145 N.H. 73, 78 (2000).  An omission of a
material fact is not a misrepresentation unless the defendant had

a duty to disclose.  <u>Ingaharro v. Blanchette</u>, 122 N.H. 54, 57
(1982).

Dolan alleges in his complaint that Jeffers negligently
misrepresented himself as an investigator working with Global
Compliance Services by not informing Dolan that he was SunGard's
"Vice President of Personnel."  Am. Compl. ¶ 70.  In response to
SunGard's motion for summary judgment, Dolan restates his claim
as misrepresentation by Jeffers in failing to explain to Dolan
that Molloy was Jeffers subordinate at SunGard.  Dolan asserts
that he would not have trusted Jeffers with his complaints about
St. Louis, Molloy, and Grimaldi if he had known that Molloy
worked for Jeffers.

Neither Dolan's first negligent misrepresentation claim nor
his restated claim satisfy the elements of that cause of action.
The record provides no evidence that Jeffers had a duty to
explain his role at SunGard or his supervisory position.  The
record also does not suggest that Dolan reasonably relied on his
assumption that Jeffers worked for Global, rather than SunGard,
or reasonably failed to investigate Jeffers's position at
SunGard, if that were important to him.  Therefore, SunGard is
entitled to summary judgment on Dolan's negligent
misrepresentation claim.

2.  <u>Fraud</u>

"The tort of intentional misrepresentation, or fraud, must be proved by showing that the representation was made with knowledge of its falsity or with conscious indifference to its truth and with the intention of causing another person to rely on the representation."  <u>Patch v. Arsenault</u>, 139 N.H. 313, 319 (1995).  Intentional concealment of a material fact is also fraud.  <u>Leavitt v. Stanley</u>, 132 N.H. 727, 729 (1990).  To prove fraud, a plaintiff also "must demonstrate justifiable reliance."  <u>Van Der Stok v. Van Voorhees</u>, 151 N.H. 679, 682 (2005) (quotation marks omitted).

Dolan asserts that Jeffers intentionally misrepresented his role at SunGard.  The record shows, however, that Jeffers identified himself as a vice president at SunGard.  Dolan offers no evidence that Jeffers made any intentionally false representations about his position at SunGard or that he intentionally concealed that information.  In addition, Dolan cannot show that he justifiably relied on his mistaken assumption based on a lack of information.

Dolan also asserts that SunGard's discrimination policy was fraudulent because the policy provides a grievance procedure through Global Compliance and represents that employee complaints will be handled by "highly trained specialists."  Obj. at 28.

41

Dolan assumed that his complaint would be investigated by Global, not by SunGard.  He argues that the grievance procedure allowed SunGard to intercept his complaint and kept him from filing a complaint with the EEOC.  He also argues that SunGard improperly withheld the complaints he made about St. Louis from him, which interfered with ability to support his EEOC complaint.

Dolan's mistaken assumptions about SunGard's grievance procedure are not a basis for a fraud claim.  His dispute with SunGard about his complaints against St. Louis also does not support a fraud claim.  Therefore, SunGard is entitled to summary judgment.

### 3.  Conspiracy

"[U]nder New Hampshire law, the elements of a civil conspiracy are: (1) two or more persons; (2) an object to be accomplished (i.e., an unlawful object to be achieved by lawful or unlawful means or a lawful object to be achieved by unlawful means); (3) an agreement on the object or course of action; (4) one or more unlawful overt acts; (5) damages as the proximate result thereof."  In re Appeal of Armaganian, 147 N.H. 158, 163 (2001) (internal quotation marks omitted).  "There must be something done pursuant to the conspiracy which harms the plaintiff."  Id.

Although in the complaint the claim is titled "Conspiracy to Commit Fraud," Dolan asserts that Molloy, Grimaldi, Jeffers, Stinchfield, Keefe, St. Louis, Thorgerson, Hope, and Traquair conspired to have him wrongfully discharged.  He argues that they tried to cause him sufficient distress to make him resign and, when that did not work, they created a non-discriminatory reason to terminate him.  Because his claims of wrongful discharge and intentional infliction of emotional distress have been resolved against him, however, Dolan lacks an object of the conspiracy to support his claim.  Further, as SunGard points out, Dolan lacks any evidence of a conspiracy.  Summary judgment in SunGard's favor is appropriate on the conspiracy claim.

G.  Equal Pay Act

The Equal Pay Act ("EPA") prohibits an employer from paying an employee less than employees of the opposite sex "for equal work on jobs . . . which are performed under similar working conditions, except where such payment is made pursuant to (I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."  29 U.S.C. § 206(d)(1).  A "plaintiff must first establish a prima facie case by showing that the employer paid different wages to

43

specific employees of different sexes for jobs performed under similar working conditions and requiring equal skill, effort and responsibility."  Ingram v. Brink's, Inc., 414 F.3d 222, 232 (1st Cir. 2005).  "Once the plaintiff establishes a prima facie case of an unlawful wage differential, the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions."  Id.

Dolan contends that he was paid less than Thorgerson for doing the same work.  SunGard contends that Dolan cannot make a prima facie case because he was paid more than two other female co-workers and because he did not do the same work as Thorgerson or perform at the same level as she did.[13]  Thorgerson handled more difficult client calls, did more research, and spent more time on quality assurance.  She also was the designated supervisor when St. Louis was absent.  SunGard asserts, based on affidavits submitted by St. Louis and Stinchfield, that the difference in pay also was justified because of Thorgerson's superior performance.

Dolan argues that he did the same work as Thorgerson but lacks evidence to prove that assertion.  Although he claims to have a quantity of evidence to show that he worked on quality

---

[13]SunGard's defense based on the pay rate of the two female CSRs is inapposite.  Dolan asserts that he performed the same job as Thorgerson and should have been paid the same amount.

assurance matters, the emails he cites do not show that was the case or, more importantly, that his work was the same as Thorgerson's work.[14]   Dolan acknowledges that Thorgerson earned higher review scores than he did but argues that St. Louis undervalued his performance.

As presented, Dolan cannot show that he performed the same work as Thorgerson or refute SunGard's proof that Thorgerson's performance was superior to his.  Therefore, summary judgment is appropriate in SunGard's favor on Dolan's EPA claim.


Conclusion

For the foregoing reasons, the defendant's motion to strike (document no. 58) is granted as to the following paragraphs in the plaintiff's affidavit:  4, 8, 11, 12, 19, 20, 25, 28, 32, 35, 36, 37, 38, 41, 44, 46, 47, 49, 54, 57, 61, and 62.  The plaintiff's motion to exclude (document no. 62) is granted for purposes of summary judgment.

The defendant's motion for summary judgment (document no. 49) is granted as to Counts 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, and 16, and on Counts 3 and 4 except the claim based on SunGard's

---

[14]The cited emails mention "test results,"  "testing," "QA comments," and that Dolan was "listed for the QA resource." Without explanation, however, those comments do not show that Dolan was performing the same work as Thorgerson.

failure to promote Dolan within the CSR group.  Summary judgment is denied on Counts 1, 2, and 7.

The plaintiff shall file a supplemental brief addressing the basis for his claim under RSA 275:56 in count 7, which shall be filed **on or before January 30, 2008.**

If appropriate, the defendant shall file a supplemental motion for summary judgment, addressing the claims in Counts 1, 2, 3, 4, and 7 that were not resolved by this order, **on or before February 11, 2008.**  The plaintiff will have **thirty days** to respond.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

January 8, 2008

cc:  Kenneth J. Barnes, Esquire
     Matthew A. Caffrey, Esquire
     William E. Hannum, III, Esquire
     Shannon M. Lynch, Esquire